PHILLIP A. TALBERT
United States Attorney
AUDREY B. HEMESATH
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

FILED
Oct 05, 2023
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ARI J. LAUER,<br><br>Defendant. | CASE NO. 2:23-cr-0261 JAM<br><br>18 U.S.C. § 1349 – Conspiracy to Commit Wire and Bank Fraud; 18 U.S.C. § 1344 – Bank Fraud (12 counts); 18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution (10 counts); 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(2)(A), and 28 U.S.C. § 2461(c) – Criminal Forfeiture |

INDICTMENT

COUNT ONE: [18 U.S.C. § 1349 – Conspiracy to Commit Wire and Bank Fraud]

The Grand Jury charges:

ARI J. LAUER,

defendant herein, as follows:

### I.   INTRODUCTION

At all times relevant to this indictment:

1. DC Solar Solutions, Inc., formerly DC Solar Manufacturing, ("Solutions"), was a solar energy device manufacturing and sales corporation that primarily solicited investors to participate in transactions organized around the manufacture and deployment in the market of mobile solar generator units.

2. DC Solar Distribution, Inc. ("Distribution"), was a separate corporation but closely

related to DC Solar Solutions, and primarily responsible for managing certain equipment sold in transactions closed by DC Solar Solutions.

3. Until in or about July 2016, both Solutions and Distribution (collectively, "DC Solar") were headquartered in Concord, California; in or about July 2016, DC Solar relocated offices to Benicia, California, in the State and Eastern District of California.

4. Although they were separate legal entities that carried separate accounting and tax obligations, Solutions and Distribution shared common employees and facilities, relied on common leadership, and operated in material respects as the single entity DC Solar.

5. Co-conspirator Jeff Carpoff, charged elsewhere, was a resident of Martinez, California, the owner and operator of DC Solar Solutions, and the Chief Executive Officer of DC Solar.

6. Co-conspirator Paulette Carpoff, charged elsewhere, was a resident of Martinez, California, the owner and operator of Distribution, and the Chief Operations Officer of DC Solar.

7. Defendant LAUER was a resident of Lafayette, California, and an attorney licensed to practice law in California. LAUER was outside counsel to DC Solar and provided legal and business advice concerning DC Solar's operations. LAUER began working with DC Solar in approximately 2009 and continued through in or about January 2019.

8. Co-conspirator Robert A. Karmann, charged elsewhere, was a resident of Clayton, California, and the Chief Financial Officer for DC Solar. Co-conspirator Robert A. Karmann began working for DC Solar in approximately August 2014.

9. Co-conspirator Ryan Guidry, charged elsewhere, was a resident of Pleasant Hill, California, and the Vice President of Operations for DC Solar. Co-conspirator Ryan Guidry began working for DC Solar in approximately May 2012.

10. Co-conspirator Alan Hansen, charged elsewhere, was a resident of Vacaville, California, and a former employee of a national telecommunications company. In that role, Hansen developed a business relationship with co-conspirator Jeff Carpoff and DC Solar in or around 2013. In or around November 2015, co-conspirator Alan Hansen accepted employment at DC Solar, where he worked until approximately February 2018.

11. Co-conspirator Ronald J. Roach, charged elsewhere, was a resident of Walnut Creek,

California, and a certified public accountant licensed in California. Roach maintained an accounting practice between 2003 and 2018 and began performing significant work for DC Solar as early as the end of 2011. Among other things, co-conspirator Ronald J. Roach prepared compiled annual financial statements for DC Solar Distribution for 2011 through 2017.

12. Co-conspirator Joseph W. Bayliss, charged elsewhere, was a resident of Martinez, California, a general contractor and electrician licensed in California, and the owner and operator of Bayliss Innovative Services, Inc., a contracting services company. Co-conspirator Joseph W. Bayliss began performing work for DC Solar in late 2013.

13. Race Company was a business involved in the ownership and management of motorsports racetracks.

14. Bank 1 was a financial institution as defined in 18 U.S.C. § 20.

15. Bank 2 was a financial institution as defined in 18 U.S.C. § 20.

16. Bank 3 was a financial institution as defined in 18 U.S.C. § 20.

17. Bank 4 was a financial institution as defined in 18 U.S.C. § 20.

18. Bank 5 was a financial institution as defined in 18 U.S.C. § 20.

19. Bank 6 was a wholly owned subsidiary of a financial institution as defined in 18 U.S.C. § 20.

## II.   THE CONSPIRACY

20. Beginning at least as early as in or about June 2012, and continuing through in or about January 2019, in the State and Eastern District of California and elsewhere, defendant ARI J. LAUER did knowingly and intentionally combine, conspire, confederate, and agree, with Jeff Carpoff, Paulette Carpoff, Bayliss, Roach, Karmann, Guidry, Hansen, and others known and unknown to the Grand Jury, to commit bank fraud and wire fraud affecting a financial institution in violation of Title 18, United States Code, Section 1349.

## III.   THE OBJECTS OF THE CONSPIRACY

21. The objects of the conspiracy were the following:

   a. To knowingly and with intent to defraud execute and attempt to execute a material scheme and artifice to defraud financial institutions as to a material matter, and to defraud

obtain and attempt to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, financial institutions, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344 (bank fraud); and

   b. To devise, intend to devise, and participate in a material scheme and artifice to defraud investors, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, half-truths, and the concealment of material facts, and for the purpose of executing the scheme and artifice to defraud and attempting to do so, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, all affecting a financial institution, in violation of Title 18, United States Code, Section 1343 (wire fraud).

### IV. MANNER AND MEANS

22. In furtherance of the conspiracy, LAUER and his co-conspirators employed the following ways and means, among others:

23. Directly and through subcontractors, Solutions built and purported to build mobile solar generators ("Generators"). The Generators, when actually built, consisted primarily of solar panels placed on a wheeled-trailer that harvested and stored solar energy for later use by customers including at such locations as sporting venues and construction sites, in remote areas and elsewhere.

24. Solutions, including through the efforts of LAUER, his co-conspirators, and others acting at their direction, sold Generators in multi-unit packages to investors. LAUER and his co-conspirators used several types of funding packages to complete these sales. For example, in many instances they sold Generators to investors through special purpose investor tax-equity funds ("Funds") created specifically for such transactions; the Funds purchased Generators with a combination of a cash down payment and long-term promissory note payable to Solutions. The transactions involving the Generators and the Funds were structured in such a way that would allow the investors to claim tax credits and other tax benefits related to the Generators. In other instances, LAUER and his co-conspirators sold Generators to investors in sales-leaseback deals where the investor purchased the Generators outright, without any long-term promissory note to Solutions. At the end a five-year term for some of the tax-

equity Fund transactions, LAUER and his co-conspirators would arrange to sell certain existing Generators from the Funds to new investors in transactions referred to as "flip deals."

25. It was an essential part of the conspiracy that the investors would never actually take possession of the Generators. As part of the transactions, Distribution typically leased those Generators from the investors and purported to sublease the Generators to third parties to generate revenue. In fact, the conspirators were often unable to sublease the Generators to third parties, contrary to representations of the conspirators and others acting at their direction that the rental market for Generators was robust. It was an essential part of the conspiracy that the conspirators hide from investors the fact there was very little actual third-party rental demand for the Generators.

26. In or about June 2012, defendant LAUER, co-conspirators Jeff Carpoff, Roach, and others met to discuss Distribution's failure to generate third-party lease revenue sufficient to meet its financial obligations to the Funds. The conspirators agreed to conceal that lack of third-party lease revenue from current and prospective investors, by, among other means, making periodic transfers of investor money paid to Solutions into Distribution's account, and misrepresenting it as third-party lease revenue earned by Distribution.

27. LAUER and the members of the conspiracy knew the existence of third-party lease revenue was material to investors. LAUER, his co-conspirators, and others acting at their direction made false representations and misled investors about third-party leasing and demand because they knew it had the capacity to influence investment decisions. As just one example, in or about February 2014, LAUER emailed Jeff Carpoff and Roach to suggest that they should use software screenshots to give an impression to a representative of Bank 1 there was extensive third-party demand for DC Solar's Generators: "I was hoping we could use the High Five software to create actual Fund accounts. Even if the data isn't real, the screenshots would look more real." LAUER emailed a Bank 1 representative while making false and misleading statements about Generator demand: "The demand far exceeds what we can build between now and 2016. We believe that market will bear another 10,000 units based upon existing demand. . . ." In truth, as LAUER knew, existing demand for the Generators by third-party lessees was low and Distribution had failed to sublease most of the Generators it had sold to investors. When a representative of Bank 1 then asked for specifics regarding Distribution's third-party lease

information, LAUER misleadingly stated in an email to a Bank 1 representative that such third-party lease information was not available. As LAUER knew, such third-party lease information was available, had recently been analyzed by Roach, and if shared would have revealed to Bank 1 that only approximately 5% of DC Solar's Generators had been leased to third parties.

28. The existence of third-party lease revenue was material to investors because, among other things, it was used as a method of valuation for the Generators, and that valuation in turn affected what size tax credits investors could claim. The conspirators told investors that the value of each new Generator was $150,000, and a material component of the typical $150,000 purchase price per Generator was the purported existence of lease revenues to be paid by third parties. Based on representations by the conspirators, the tax-equity Fund investors expected third-party lease revenue to, over time, pay down the remaining approximately 70% that Fund investors typically still owed on the purchase price of the Generators. Sales-leaseback investors expected third-party lease revenue to be one of the financial benefits of their purchase, and in flip deals the third-party lease revenue was the primary financial incentive to purchase the Generators because the tax credits had already been claimed by the original investor.

29. To encourage investors to purchase Generators from DC Solar and to avoid detection of the conspiracy as it progressed, LAUER, his co-conspirators, and others acting at their direction made material representations to investors, through oral statements and written materials, including that (a) the Generators would be built and/or existed in quantities and conditions of operability consistent with the representations of the conspirators; (b) Distribution had subleased and could sublease the Generators to third-party end-users pursuant to written lease agreements; (c) there was a substantial market for the Generator subleases; and (d) revenue would be generated from this third-party sublease market.

30. In fact, those statements were materially false in that (a) the Generators were not built in the quantities represented and did not exist in the quantities and the conditions of operability represented; (b) Distribution had not subleased and could not sublease the Generators to third-party end-users in the quantities or on the terms represented; (c) the market for Generator subleases was significantly less than represented; and (d) for the tax equity and sales-leaseback deals, the transactions

were not executed in a such a way that they could lawfully qualify for tax credits and other tax benefits, in part, because the Generators that formed the basis of the transactions often did not exist, or did not exist in the quantities claimed, and/or were not being used consistent with the representations made by the conspirators.

31. To support the false claims made to investors and to avoid detection of the scheme, the conspirators took steps including materially falsifying Commissioning Reports and other records related to the Generators and replacing Vehicle Identification Numbers ("VIN") on Generators to make it appear that more Generators had been built than had actually been constructed. In some instances, the conspirators sold and/or attempted to sell the same Generator to more than one Fund, switching the VIN numbers on existing Generators to defeat investor inspections. In some instances, the conspirators buried GPS devices (purportedly affixed to Generators) to create the appearance those Generators were at those locations when they were not. In other instances, the conspirators moved Generators to locations before site inspections to create the appearance those Generators had been at those spots when they had not been.

32. To further conceal the ongoing scheme and to encourage additional investments, defendant LAUER, his co-conspirators, and others acting at their direction, created the appearance of revenue from Generator subleases by operating a Ponzi-type flow of payments between Solutions and Distribution and taking steps to conceal it, including but not limited to the following. First, the members of the conspiracy discussed setting up a reserve fund that would be filled by new investor money and be available to pay future lease and note payment obligations, because the members of the conspiracy knew the third-party lease revenue was inadequate to meet these obligations. Second, the members of the conspiracy created an accounting method they referred to as "re-rent"—a circular payment system of funding from Solutions to Distribution designed to hide the lack of third-party revenue. Third, in or about June 2014, LAUER and other members of the conspiracy wrote a "re-rent agreement," backdating the document to 2011, for the purpose of avoiding detection of the conspiracy by one or more ongoing audits. The conspirators used the re-rent agreement to give the appearance of revenue by claiming that Solutions was subleasing Generators from Distribution, in order to explain the large sums of money being transferred from Solutions to Distribution with no other purpose. In reality, the re-rent agreement

was a fiction, as there were no Generators actually utilized by Solutions, and Solutions did not owe Distribution any money. The real source of money was new investor money, which was being used to pay obligations to existing investors.

33. To further the ongoing fraud and to avoid detection of the scheme, defendant LAUER and his co-conspirators agreed to conceal the true financial structure of DC Solar and the true nature and extent of third-party Generator subleases from current and prospective investors through materially false representations and supporting documents. Among other means, the conspirators agreed to prepare and disseminate false compiled annual financial statements, which falsely represented that DC Solar Distribution had earned revenue in sufficient amounts to support its obligations under its master leases with the Funds. The conspirators completed those false financial statements knowing they would be shared with investors and intending investors to rely on the false misrepresentations they contained.

34. To encourage new investments, further the ongoing fraud, and avoid detection of the scheme, LAUER and his co-conspirators deceived financial institutions and other entities into investing in Generators, including by claiming third party lease or utilization information was confidential, or by materially misleading those investors regarding the nature and extent of Distribution's supposed third-party sublease contracts. One way in which LAUER and the members of the conspiracy deceived some investors was by preparing sublease agreements with a third-party end-user that was negotiated alongside additional promised agreements: sponsorship advertising agreements in which Distribution would agree to sponsorship advertising deals to incentivize the third-party end-user to contract to sublease Generators that they did not need and would not lease without the incentive of the sponsorship deals. LAUER and the members of the conspiracy created undisclosed addendums to the third-party end-user sublease deals that allowed for an earlier termination of the subleases than was apparent on the face of the subleases. Standing alone, the sublease contracts with third-party end-user gave the appearance of a fixed amount of lease revenue over an extended fixed time period for a specific number of Generators. But the addendums materially altered these contractual terms. LAUER and other members of the conspiracy purposely disclosed to investors only those portions of the third-party sublease contracts favorable to Distribution, proceeding on the false pretense and half-truth that the disclosed portion of the third-party sublease contracts accurately represented the future revenue stream

associated with the Generators that the investors were about to purchase.

35. As one example of the fraud technique described in the prior paragraph, in or about September 2017, LAUER was involved in negotiating and transmitting documents for an approximately $75 million transaction with Bank 6. Bank 6 purchased 500 Generators from DC Solar Solutions and leased them back to Distribution. Distribution was then in turn supposedly going to sublease those Generators to third-party end-user Race Company in exchange for fixed lease payments for 10 years. LAUER, among other members of the conspiracy, communicated directly with representatives of both Bank 6 and Race Company to close this transaction. The main body of the third-party sublease contract with Race Company made it appear that Race Company was contractually obligated to lease the 500 Generators for 10 years at a fixed rate in the millions of dollars per year, with no mention of any money being paid the other direction from DC Solar to Race Company as a part of the transaction. In truth, as LAUER knew, DC Solar entered into a concealed contract addendum with Race Company that cut Race Company's required sublease payment period in half from 10 years to five years, and furthermore only required Race Company to sublease the Generators if DC Solar paid that Race Company substantial sponsorship advertising money. In other words, DC Solar had to pay Race Company, or Race Company would not be contractually required to make Generator lease payments. Bank 6 was not aware of these material changes in the contract terms, because LAUER and other members of the conspiracy knowingly and intentionally disclosed only the half-truth of the 10 year sublease, and concealed the existence of the addendum and sponsorship agreements.

36. As another example of this same technique, in or about October 2018 (over a year after the $75 million Bank 6 transaction closed) Bank 6 was considering another DC Solar investment. When a Bank 6 representative sought to confirm information about the sublease with Race Company, LAUER responded falsely by email, "The ten-year term of the [Race Company] Sublease began on 9/25/2017. The obligation of the sublessee to pay rent begins on delivery of each unit and is prorated for partial months." This statement was materially false, misleading, and half-true at best because (a) in truth and in fact, as LAUER knew, the addendum had reduced the time period of obligated sublease payments to five years at best, and (b) even then, as LAUER knew, Race Company's obligation to pay was contingent not just on delivery of Generators, but on DC Solar continuing to make sponsorship

advertising payments to Race Company. LAUER's email furthered the conspiracy and operated as a lulling statement directed to Bank 6 because, as LAUER knew, if Bank 6 or its representatives learned the true nature of the Race Company sublease, that revelation would jeopardize any new Bank 6 deal and would risk Bank 6 discovering DC Solar's past deception and seeking to retrieve its funds.

37. It was a part of the conspiracy that Distribution made payments to investors that appeared to be the third-party lease revenue the investors were expecting, while in reality, as LAUER and the members of the conspiracy knew, the source of payment was mostly new investor money. The purpose of making these payments was to lull investors into keeping their money invested in existing deals, to avoid detection of the scheme by investors and law enforcement, and to induce existing and new investors to make new investments.

38. It was a part of the conspiracy that members of the conspiracy would spend lavishly on things such as holiday parties and hiring famous entertainers to give the impression of financial prosperity. The members of the conspiracy engaged in this spending at least in part to give employees and others working on behalf of DC Solar in securing new investors the belief that the DC Solar business model was highly successful, i.e., that third-party end-user revenue payments were being made as contemplated by the investors, and that the market demand for Generators was so high as to fuel the opulence of DC Solar and the Carpoffs. If the employees, brokers, and other attendees at these parties had understood the truth DC Solar was being funded largely by a Ponzi-type scheme of using new investor money to pay existing obligations, and that this apparent wealth was only an illusion, it would have caused scrutiny of the existing investment deals and discouraged the obtainment of new investors.

39. Between at least as early as March 2011 and December 18, 2018, investors entered into transactions with DC Solar through approximately thirty-four Funds. Some investors invested through more than one Fund. The investors, through the Funds, collectively deposited by interstate wire transfer approximately $759,400,000 into bank accounts for the Funds established for the transactions. Further, several financial institutions and other investors transferred collectively $152,700,000 to DC Solar as part of related transactions for the purchase and lease of Generators, including for sales-leaseback and flip deals. In total, DC Solar closed transactions with Funds and others that contributed an aggregate of more than $912,000,000 to purchase Generators. Those transactions purportedly involved

INDICTMENT 10

approximately 17,000 Generators, at approximately $2.5 billion in purported value.

40. At all times relevant, approximately 94% to 95% of the supposed lease revenue on Distribution's books was actually just disguised intercompany transfers of new investor money from Solutions. At all times relevant, real third-party end-user demand for Generators never exceeded 5% of claimed revenue for Distribution.

All in violation of Title 18, United States Code, Section 1349.

COUNTS TWO THROUGH THIRTEEN: [18 U.S.C. § 1344 – Bank Fraud]

The Grand Jury further charges:

ARI J. LAUER,

defendant herein, as follows:

## I. INTRODUCTION

At all times relevant to this Indictment:

1. Paragraphs 1 through 19 of Count One of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

## I. THE SCHEME AND ARTIFICE TO DEFRAUD

2. Beginning in or about June 2012 and continuing through in or about January 2019, On or about the dates specified in the table below, in the State and Eastern District of California and elsewhere, LAUER did knowingly, and with the intent to defraud, execute and attempt to execute a material scheme and artifice to (1) defraud each financial institution listed below, and (2) obtain the moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of, each financial institution listed below by means of materially false and fraudulent pretenses and representations, half-truths, and the active concealment of material facts.

## II. MANNER AND MEANS

In furtherance of the scheme and artifice to defraud and to obtain money, funds, credits, assets, securities, and other property, LAUER employed, among others, the following manner and means:

3. Paragraphs 21 through 40 of Count One of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

INDICTMENT 11

## III.  EXECUTIONS OF THE SCHEME

4. On or about the following dates, LAUER did knowingly execute and attempt to execute the scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses and representations, half-truths, and the active concealment of material facts, the monies, funds, credits, assets, securities, and other property owned by and under the custody and control of each of the following financial institutions as set forth below:

| COUNT | FINANCIAL INSTITUTION | FUND No. | NUMBER OF GENERATORS | ON OR ABOUT DATES OF FUNDING | APPROXIMATE AMOUNT OF INVESTMENT |
|---|---|---|---|---|---|
| 2 | Bank 1 | VI | 135 | December 24, 2013 – December 29, 2014 | $7,438,098 |
| 3 | Bank 1 | XII | 202 | December 19, 2014 – August 24, 2015 | $11,128,856 |
| 4 | Bank 1 | XIX | 175 | December 24, 2015 – June 29, 2016 | $9,596,239 |
| 5 | Bank 2 | VII | 227 | March 28, 2014 – April 7, 2014 | $10,011,721 |
| 6 | Bank 2 | XIV | 227 | March 18, 2015 – March 27, 2015 | $10,011,721 |
| 7 | Bank 2 | XXXII | 430 | June 30, 2017 – July 24, 2017 | $20,114,325 |
| 8 | Bank 3 | X | 101 | September 19, 2014 – September 14, 2015 | $5,849,415 |
| 9 | Bank 3 | XV | 172 | March 10, 2015 – April 22, 2016 | $9,961,381 |
| 10 | Bank 3 | XXII | 225 | March 22, 2016 – July 5, 2017 | $13,030,874.75 |
| 11 | Bank 4 | N/A | 416 | July 31, 2017 | $27,383,000 |
| 12 | Bank 5 | N/A | 34 | June 2017 | $5,100,000 |
| 13 | Bank 5 | N/A | 42 | December 2017 | $6,300,000 |

All in violation of Title 18, United States Code, Sections 2 and 1344.

INDICTMENT                                    12

COUNTS FOURTEEN THROUGH TWENTY-THREE: [18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution]

The Grand Jury further charges:

ARI J. LAUER,

defendant herein, as follows:

## I. INTRODUCTION

At all times relevant to this Indictment:

1. Paragraphs 1 through 19 of Count One of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

## II. THE SCHEME AND ARTIFACE TO DEFRAUD

2. Beginning no later than in or about June 2012 and continuing through in or about January 2019, in the Eastern District of California and elsewhere, LAUER and others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a material scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, half-truths, and the active concealment of material facts, all affecting a financial institution.

3. The purpose of the scheme and artifice was to defraud investors, including among others Bank 3, Bank 4, Bank 5, and Bank 6, by luring the investors into participation in the purchase and other transactions organized around the supposed manufacture and deployment in the market of Generators.

## III. MANNER AND MEANS OF THE SCHEME

4. Paragraphs 21 through 40 of Count One of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

## IV. USE OF WIRE COMMUNICATIONS

5. On or about the dates set forth below, in the State and Eastern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud, and attempting to do so, LAUER did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, specifically:

INDICTMENT 13

| COUNT | TRANSMISSION DATE | DESCRIPTION |
|---|---|---|
| 14 | September 9, 2014 | Email from LAUER to a representative of Bank 3 with projections about Distribution's occupancy factor; LAUER communicates a 95% occupancy factor |
| 15 | May 31, 2017 | Email from LAUER of a fraudulent Estoppel Certificate to a representative of Bank 4; the Estoppel Certificate indicated falsely that a third-party end-user was current on lease obligations of $1.1 million per month |
| 16 | June 30, 2017 | Email from LAUER to a representative of Bank 5 with the sublease with Race Company indicating a 10-year lease term and not including the lease addendum |
| 17 | June 19, 2018 | Email from LAUER to a representative of Bank 4 to negotiate terms after Bank 4 demanded repayment of its investment; LAUER includes a term that Bank 4 will not receive any documents that would reveal the lack of sublease payments |
| 18 | October 18, 2018 | Email from LAUER to a broker for DC Solar, in response to an inquiry from a representative for Bank 6, falsely stating that the term of the Race Company sublease was ten years |
| 19 | October 30, 2018 | $232,500 lease payment from DC Solar Distribution CTBC bank account to Bank 6 |
| 20 | November 1, 2018 | $144,200 lease payment from DC Solar Distribution CTBC bank account to Bank 5 |
| 21 | November 21, 2018 | $350,000 wire transfer from DC Solar Solutions CTBC bank account to William Morris Endeavor Entertainment City National Bank account for Musical Performer 1's performance at the DC Solar holiday party |
| 22 | November 30, 2018 | Email from LAUER giving approval for Jeff Carpoff to sign off on a Bank 6 Letter of Intent, pending resolution of three open items |
| 23 | December 4, 2018 | Email from LAUER directing redaction of certain terms before a Letter of Intent was sent to Race Company in furtherance of the Bank 6 deal |

All in violation of Title 18, United States Code, Sections 2 and 1343.

//
//
//

INDICTMENT       14

<u>FORFEITURE ALLEGATION</u>: [18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(2)(A), and 28 U.S.C. § 2461(c) – Criminal Forfeiture]

1. Upon conviction of one or more of the offenses alleged in Counts One and Fourteen through Sixteen of this Indictment, defendant ARI J. LAUER shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, which constitutes or is derived from proceeds traceable to such violations, including but not limited to the following:

   a. A sum of money equal to the total amount of proceeds traceable to such offenses, for which defendant is convicted.

2. Upon conviction of one or more of the offenses alleged in Counts Two through Thirteen of this Indictment, defendant ARI J. LAUER shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting or derived from proceeds obtained directly or indirectly, as a result of said violations, including but not limited to the following:

   a. A sum of money equal to the amount of proceeds obtained directly or indirectly, as a result of such offenses, for which defendant is convicted.

3. If any property subject to forfeiture, as a result of the offenses alleged in Counts One through Sixteen of this Indictment, for which defendant is convicted:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third-party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty;

//
//
//
//
//
//

INDICTMENT

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of defendant, up to the value of the property subject to forfeiture.

A TRUE BILL.

/s/ Signature on file w/AUSA

_____
FOREPERSON

*[signature]*

PHILLIP A. TALBERT
United States Attorney

INDICTMENT                        16

2:23-cr-0261 JAM

No. _____

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

THE UNITED STATES OF AMERICA
*vs.*

Ari J. Lauer

## INDICTMENT

**VIOLATION(S):**  18 U.S.C. § 1349 – Conspiracy to Commit Wire and Bank Fraud
18 U.S.C. § 1344 – Bank Fraud (12 Counts)
18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution (10 Counts)
18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(2)(A) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

*A true bill,*

/s/ Signature on file w/AUSA
_____
*Foreman.*

*Filed in open court this* __5th__ *day of* __October__, *A.D. 20* __23__

/s/ R. Alvarez
_____
*Clerk.*

*Bail, $* __No Bail Bench Warrant__

/s/ Carolyn K. Delaney
_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

## United States v. Lauer
## Penalties for Indictment

**Defendants**
ARI J. LAUER

### COUNT 1:

VIOLATION:       18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud

PENALTIES:       Up to 30 years of imprisonment; or
                 A fine of up to $250,000; or
                 Both fine and imprisonment;
                 Supervised release of up to 5 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

### COUNTS 2-13:

VIOLATION:       18 U.S.C. § 1344 – Bank Fraud

PENALTIES:       Up to 30 years of imprisonment; or
                 A fine of up to $1,000,000; or
                 Both fine and imprisonment;
                 Supervised release of up to 5 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

### COUNTS 14-23:

VIOLATION:       18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution

PENALTIES:       Up to 30 years of imprisonment; or
                 A fine of up to $1,000,000; or
                 Both fine and imprisonment;
                 Supervised release of up to 5 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

### FORFEITURE ALLEGATION:

VIOLATION:       18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(2)(A), and 28 U.S.C. § 2461(c) – Criminal Forfeiture
PENALTIES:       As stated in the charging document